NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0461n.06

No. 16-1602

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 08, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| DEVIN SMITH, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE: BOGGS, GRIFFIN, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** A jury convicted defendant-appellant Devin Smith of two counts of sex trafficking by force, fraud, or coercion, 18 U.S.C. § 1591(a)(1), and one count of sex trafficking of children, 18 U.S.C. § 1591(a)(1); and failed to reach a verdict on a final count of sex trafficking by force, fraud, or coercion. Smith appeals, arguing that the district court: (1) failed to enforce its sequestration order; (2) made multiple reversible evidentiary errors; (3) violated Smith's right to testify in his own defense; (4) engaged in judicial misconduct; and (5) committed cumulative errors warranting a new trial. He additionally argues that the Government failed to turn over *Brady* evidence. We affirm.

## I. Background

Devin Smith was convicted of three out of four counts of sex trafficking after an eight-day jury trial. There were four alleged victims of Smith's trafficking: H.E. (count one), B.W (count two), A.S. (count three), and M.R., a minor (count four). The jury deliberated for just

over eight hours, and failed to reach a verdict on count three of the superseding indictment. The district court sentenced Smith to 360-months' imprisonment on each count to run concurrently.

At trial, the Government's proof consisted largely of the testimony of the victims, law-enforcement officers, and two of Smith's confederates, as well as forensic evidence taken from Smith's laptop and iPhone. The phone and laptop contained significant evidence that Smith had used the website "Backpage.com" to advertise the victims' prostitution services. The Government's theory was that Smith coercively sex trafficked the four victims through violence, intimidation, and the provision of crack cocaine, upon which the victims became dependent. Smith argued that the women in the first three counts prostituted voluntarily and that he therefore did not use force, fraud, or coercion. He also argued that he was not the pimp for M.R., the minor; Smith argued that Steven "Slim" Barber was M.R.'s boyfriend and pimp.

Smith's appeal focuses on the conduct of the district court and the Government. First, Smith asserts a *Brady* claim, arguing that the Government withheld the forensic report of Steven Barber's cell phone and that this report was both material and exculpatory. Specifically, Smith asserts he would have used the forensic report to impeach M.R.'s testimony. Smith also argues that the district court violated his right to testify in his own defense, and that the district court made numerous evidentiary errors that either individually or cumulatively deprived him of a fair trial. Finally, Smith argues that the district court demonstrated judicial bias and misconduct by criticizing Smith's case in front of the jury, limiting Smith's cross-examination attempts, and using the terms "Form Guilty" and "Guilty Form" to describe the verdict form.

## II. Analysis

### A. *Brady* Violation

*Brady v. Maryland*, 373 U.S. 83, 86 (1963), requires the government "to turn over material that is both favorable to the defendant and material to guilt or punishment." *United*

*States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994). To establish a *Brady* violation, Smith must show that (1) the evidence was suppressed, either willfully or inadvertently; (2) the evidence was favorable to Smith; and (3) the evidence was material and prejudice ensued from its suppression. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The government is required to disclose material evidence favorable to the accused even when the defendant fails to request the evidence. *Id.* at 280. Evidence is favorable to a defendant if it is exculpatory or if it allows a defendant to impeach witnesses. *United States v. Blackwell*, 459 F.3d 739, 758 (6th Cir. 2006). However, in the *Brady* context, evidence is material only if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A defendant establishes a reasonable probability of a different result when the suppression of the evidence "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 424 (1995) (quoting *Bagley*, 473 U.S. at 678). We review the denial of a motion for a new trial based on a *Brady* violation for abuse of discretion, but we review a district court's determination whether a *Brady* violation occurred de novo. *United States v. Fields*, 763 F.3d 443, 458 (6th Cir. 2014).

Here, Smith asked the Government on the final day of trial if it possessed a forensic report of Steven Barber's cell phone. The Government claimed it had not made a forensic report of Barber's phone and that Smith had previously received all forensic reports in the case. However, on December 5, 2014, ten days after the jury rendered its verdict, the Government informed Smith that the Government had in fact examined Barber's phone on July 27, 2013, and provided Smith with the forensic report. The forensic report included (1) text messages indicating that Barber was attempting to prostitute a woman of Hispanic origin, as well as

messages indicating that M.R. was discussing sexual acts with potential customers in Spanish[1]; (2) photographs of M.R. that appear to have been taken with the phone in anticipation of producing ads for sex trafficking; (3) web history indicating that the user of the phone visited Backpage.com; and (4) information indicating that M.R. may have been using the phone.

The Government concedes the first *Brady* prong—the information from Barber's phone was in the Government's possession and not disclosed to Smith. The second *Brady* prong is also easily satisfied. First, the evidence was favorable because it shows that Barber was heavily involved in trafficking M.R. This supports Smith's theory that Barber, and not Smith, served as M.R.'s pimp, and that M.R. testified falsely to protect Barber. Second, the evidence would have enabled Smith to impeach M.R.'s testimony. M.R. testified that only Smith created the online advertisements for her services and that Barber did not even know how to create the advertisements. Evidence of Barber's web history showing that he maintained prostitution ads on Backpage.com directly contradicts this testimony. M.R. also testified that Smith gave her a phone, and that she used this phone to set up her prostitution dates. The forensic report, however, indicates that Barber's phone was also used to traffic M.R.

Although this evidence may have been helpful to Smith, it does not undermine our confidence in the verdict, and Smith has therefore not shown that the evidence was material under *Brady*. The Government's theory at trial was that both Smith and Barber trafficked M.R. Evidence showing that Barber's phone was used to post M.R.'s prostitution advertisements and set up prostitution dates is consistent with this theory.

---

[1] One of M.R.'s prostitution aliases was "Dominican Princess." M.R. speaks Spanish while Barber and Smith do not.

The evidence also does not significantly undermine M.R.'s testimony. Smith argues that he would have used the evidence from Barber's phone to show that M.R. testified falsely to protect Barber at the expense of Smith. However, M.R.'s testimony did not protect Barber—she repeatedly testified that Barber prostituted her as well. Moreover, even if Smith had successfully impeached M.R., the Government presented a large amount of evidence proving Smith's involvement in trafficking M.R.: Smith was arrested in a hotel room with M.R.; Smith was on his computer at the time of the arrest; Smith's computer and cell phone contained photographs of M.R.; and Smith's computer had web history that included the prostitution advertisements of M.R. The forensic report of Barber's cell phone does not contradict any of this evidence.

Although Smith is correct that the Government should have disclosed the forensic report, we are confident that the verdict was unaffected by the Government's failure to do so.

**B. Sequestration Order**

Smith next argues that the district court erred in permitting M.R. to testify after she spoke with a victim-witness specialist during a break in her testimony in violation of the court's sequestration order. A district court's decision allowing a witness who has violated a sequestration order to testify is reviewed for abuse of discretion. *United States v. Rugiero*, 20 F.3d 1387, 1392 (6th Cir. 1994).

Before the trial began, the Government invoked Federal Rule of Evidence 615, which requires a court, at the request of a party, to order witnesses excluded from the courtroom "so that they cannot hear other witnesses' testimony." Fed. R. Evid. 615. The district court issued a "courtroom procedures and decorum" order that addressed sequestration. The order stated that "[i]f witnesses are sequestered, counsel must assure that each witness called . . . understands that (s)he **may not** discuss the testimony (s)he expects to give or has given in the matter before the

court . . . [and] should anyone attempt to discuss the testimony (s)he has given or expects to give . . . (s)he **may not** engage in such discussion." R. 45, PID 229. Sequestered witnesses were permitted to discuss testimony or prospective testimony with counsel.

"The purpose of sequestering witnesses is to preclude coaching or the influencing of a witness' testimony by another witness." *United States v. Miller*, No. 97-6356, 1999 WL 357777, at *6 (6th Cir. May 20, 1999) (unpublished table decision). However, "[t]he decision whether a witness who fails to obey a sequestration order may subsequently take the stand is undoubtedly one for the trial court." *United States v. Gibson*, 675 F.2d 825, 835 (6th Cir. 1982). A witness who violates a sequestration order is not automatically barred from testifying. *Id.* at 835–36. A district court may minimize the impact of a violation of a sequestration order by allowing the aggrieved party to cross-examine the witness about the violation. *See United States v. Solorio*, 337 F.3d 580, 594–95 (6th Cir. 2003); *see also Miller*, 1999 WL 357777, at *8 ("Miller has not shown prejudice to his ability to receive a fair trial, particularly since the district court permitted cross-examination of the witnesses concerning any coaching they may have received."). Finally, in order to receive a new trial based on a sequestration violation, "there must be not only an abuse of discretion, but a showing that the error prejudiced the defendant's ability to receive a fair trial." *Miller*, 1999 WL 347777, at *8.

The violation of the sequestration order occurred during a break in M.R.'s testimony. Prior to the break, M.R. repeatedly testified that she did not recall details of a night where she purportedly saw Smith and a few other men go outside with two women, heard two gunshots, and did not see the women again. During the twenty-one minute recess, M.R. spoke with an FBI victim-witness specialist. The specialist had driven M.R. to court that day, and spoke with her during the recess to ask M.R. if she was feeling scared or intimidated. Outside the presence of

the jury, Smith's counsel represented to the court that the specialist had told the prosecutor that she had a "come to Jesus" moment with M.R., and that Smith's counsel interpreted this to mean that the specialist told M.R. to change her testimony. In response, the Government informed the court that M.R. told the specialist that she was afraid of Smith and that Smith was intimidating her during her testimony. The Government did not dispute the "come to Jesus" conversation, but argued that the phrase did not mean that M.R. was going to change her testimony. Smith's counsel requested that a record be made of the conversation between M.R. and the specialist. The district court concluded that the specialist was in a "very different category from most people" because her job is to work with victims, and that although "maybe a record should be made . . . I don't think it's going to change anything." R. 95, PID 672. The district court stated that if necessary, a record of the conversation could be made later but that the court was "not going to close things down to do that right now." R. 95, PID 672. Defense counsel did not ask to make a record of the conversation later in the trial.

After the recess, the Government re-asked M.R. the questions she previously could not answer. M.R. answered the questions with information incriminating to Smith. *See, e.g.*, R. 95, PID 675 (after previously not recalling whether Smith had taken out a gun in front of her, M.R. testified that she had seen him take out his gun during an argument with a marijuana dealer). However, Smith's counsel was permitted to cross-examine M.R. about her conversation with the victim specialist. During cross-examination, M.R. testified that although she discussed her testimony with the specialist, the specialist did not give her "pointers as to how to testify." R. 95, PID 701. M.R. testified that the specialist told her not to just say "I don't know" in order to avoid answering questions, and that "[i]t's okay to be nervous, but to be honest and tell the truth." R. 95, PID 701.

Although it would have been preferable for the district court to have made a record of the conversation between M.R. and the victim specialist, counsel never renewed the request, and the district court did not abuse its discretion in permitting M.R. to testify after the conversation. The victim specialist was not a witness in the case—she is thus arguably outside the scope of Rule 615. *See United States v. Pope*, 335 F. App'x. 598, 602 (6th Cir. 2009) (expressing "considerable doubt" as to whether Rule 615 applies to discussions between a witness and government agents during recess, and noting that there is a circuit split on the issue). Nevertheless, M.R.'s discussion with the specialist violated the district court's pre-trial order, which declared that sequestered witnesses were only permitted to discuss their testimony with their counsel.

However, the district court is vested with considerable discretion in determining whether to permit a witness to testify despite violation of a sequestration order. Here, it is not apparent that M.R. received any coaching. Smith emphasizes the "come to Jesus" comment, but both the Government and M.R. disputed that the specialist told M.R. what to say. Indeed, M.R. testified that the specialist simply told her to tell the truth. *See Pope*, 335 F. App'x at 602 (concluding that government agents did not influence witness testimony when the witness "testified that [the agents] merely tried to calm her nerves and reminded her to tell the truth"). Additionally, Smith does not argue that the Government intentionally sent the specialist to coach M.R. on her testimony. *See United States v. Martin*, 516 F. App'x. 433, 448 (6th Cir. 2013) (concluding that mistrial was unwarranted "even assuming a sequestration violation" because defendants did not allege facts "to support their assertion that the government consented to or had knowledge of the witnesses' coordination of testimony"). Most importantly, Smith's counsel was permitted to cross-examine M.R. about her conversation with the specialist.

Because the district court has broad discretion in enforcing sequestration orders and Smith cannot show that M.R.'s conversation with the victim specialist prejudiced his ability to receive a fair trial, we conclude that the district court did not abuse its discretion in permitting M.R. to testify despite violating the sequestration order.

### C. Evidentiary Rulings

A trial court's evidentiary rulings are also reviewed for abuse of discretion. *United States v. Lopez-Medina*, 461 F.3d 724, 741 (6th Cir. 2006). However, when a party failed to object to an evidentiary ruling, this court reviews only for plain error. *See United States v. Hadley*, 431 F.3d 484, 498 (6th Cir. 2005). Even when a district court abuses its discretion in admitting evidence, this court reviews for harmless error. To show harmless error, "the government must show by a preponderance of the evidence that the error did not materially affect the verdict." *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015) (emphasis omitted). However, "when an error of *constitutional* magnitude occurs, the government must prove beyond a reasonable doubt that the error did not affect the verdict." *Id.* (emphasis omitted).

Smith raises a number of challenges to the district court's evidentiary rulings. The specific evidentiary challenges are discussed below, but Smith also asserts that the district court's general approach to evidentiary rulings was in error. Smith points to the following conduct by the district court in support of this assertion: (1) the district court overruled Smith's hearsay objection and explained that "this is a situation where maybe some of the stricter rules of evidence that we're used to using in the courtroom are not entirely – don't allow or promote the placing on the record and the putting before the jury the fullest kind of record that this witness or some other witness might have," R. 95, PID 677; and (2) the district court overruled a hearsay objection by the Government on the grounds that "as with all of the objections of the Defendants,

relationships and information in this case are pretty much res gestae right across the board as far as I'm concerned."[2]  R. 99, PID 1216.  However, these statements do not address the specific bases of Smith's appeal.

Smith's evidentiary challenges largely allege that admitted testimony was inadmissible hearsay, Fed. R. Evid. 801(c) (defining hearsay as a statement that "the declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter asserted in the statement"), or that the district court violated Federal Rules of Evidence 612 or 613.  Rule 612 permits a party to refresh a witness's memory using a writing, provided that the "adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness about it, and to introduce in evidence any portion that relates to the witness's testimony."  Fed. R. Evid. 612(b).  Although "[t]he propriety of permitting a witness to refresh his memory from a writing prepared by another largely lies within the sound discretion of the trial court," *United States v. Marrero*, 651 F.3d 453, 472 (6th Cir. 2011) (alteration in original) (citation omitted), Rule 612 "is not an independent source of admissibility, but rather a means to refresh a witness's memory on an admissible subject of testimony."  *United States v. Holden*, 557 F.3d 698, 703 (6th Cir. 2009).  Rule 613(b) permits the introduction of extrinsic evidence of prior inconsistent statements "if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it."  Fed. R. Evid. 613(b).  Generally, prior inconsistent statements should "be admitted only for the limited purpose of determining the witness's credibility," and a

---

[2]  Res gestae evidence is only admissible when it is "'inextricably intertwined' with the charged offense."  *United States v. Clay*, 667 F.3d 689, 697 (6th Cir. 2012) (citation omitted).  Res gestae is "not an open ended basis to admit any and all other act evidence the proponent wishes to introduce."  *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000).

limiting instruction to that effect is appropriate. *Apanovitch v. Houk*, 466 F.3d 460, 486 (6th Cir. 2006). However, the Advisory Committee Notes to Rule 801(d) explain that "[i]f the witness admits on the stand that he made the statement and that it was true, he adopts the statement and there is no hearsay problem. The hearsay problem arises when the witness on the stand denies having made the statement or admits having made it but denies its truth."

There were no evidentiary errors that warrant a new trial. First, there is one statement that the Government concedes was hearsay and improperly admitted. During the Government's examination of a police officer who had searched a hotel room associated with Smith's prostitution of B.W., the Government asked the officer whether anything in the hotel room belonged to B.W. The officer testified that there were papers in the room, but that he did not personally look at the papers. The Government asked the officer what he remembered about the papers, and the officer testified that his "recollection is that Officer Biggins told [him] those papers were relating to [B.W.]" R. 97, PID 952. Smith made a hearsay objection and requested the answer be stricken. The district court overruled the objection, finding that it "is res gestae information having to do with what is at stake." R. 97, PID 953. Although the testimony was hearsay, its significance was minimal. The incident involving B.W.'s presence in the hotel room was largely undisputed. Smith argued that his taking B.W. from the hotel room "wasn't an abduction. This was Mr. Smith going and getting her, taking her away from a pimp, a pimp she was scared of." R. 101, PID 1539. Because Smith conceded that the incident occurred, evidence corroborating B.W.'s presence in the hotel room did not affect the verdict.

The other instances of improper hearsay rulings asserted by Smith did not result in any hearsay being admitted into evidence. That is, although Smith's objections to the Government's questions were proper, the Government did not actually follow through and elicit any out-of-

court statements. Specifically, Smith cites his overruled hearsay objection to a hotel manager's testimony. There, the Government provided the manager with a police report to refresh her recollection, and then asked her about renting a particular hotel room. The manager testified that her "front desk must have passed along the information to me and I gave it to the detective when he came in, and the information that she had passed on to me is what is said on there." R. 97, PID 981. Smith objected that what the front desk told the manager was hearsay, and the district court overruled the objection. However, the Government moved on and did not ask the manager what the front desk actually told her. In any event, the information at issue was on the hotel's rental folio, which had already been admitted into evidence.

Smith also asserts that a police officer's testimony about the injuries suffered by Smith's confederate Michael Peavey constituted inadmissible hearsay. After testifying that Peavey had "several marks on his upper left arm," the Government improperly asked the officer "what were you told those marks on his upper left arm had been caused by?" R. 97, PID 1029. Smith objected that the question called for a hearsay answer, and the court incorrectly overruled the objection. However, upon being told to answer the question, the officer testified that his "assumption was the red marks on his upper left arm were taser burns and it's obvious that the other mark was some type of struggle mark." R. 97, PID 1030. Thus, the officer did not testify to an out-of-court statement, and no hearsay was elicited.

Smith also asserts a number of specific instances of the Government's misuse of prior inconsistent statements. First, Smith argues that the Government improperly used prior inconsistent statements to impeach M.R. During M.R.'s testimony, she was reluctant to provide details about Smith's violence towards her, and, in response to the Government's question whether Smith would "specifically do anything else" to her, M.R. testified "[u]h-uh." R. 95, PID

676–77.  The Government then asked M.R. if she remembered making a more specific statement to an FBI agent about what Smith would do to her if she did not earn $1,000 per day, and asked, "[d]o you remember what you said?"  R. 95, PID 677.  The district court overruled Smith's objection and request for a limiting instruction.  Although the Government returned to this line of questioning, asking, "[d]id [Defendant] ever use something to hit you?"  R. 95, PID 678, it never elicited an answer from M.R. about what she said to the FBI agent.  Since no prior inconsistent statements were used in this questioning, no limiting instruction was necessary.

Three of Smith's prior-inconsistent-statement challenges arise from H.E.'s testimony.  First, after H.E. testified she could not remember much from the night she called 911 because she was high on crack, the Government reminded H.E. that she had previously discussed the events of that night with an FBI agent, and Smith asserts that the reminder "triggered [H.E.] to remember more."  Appellant Br. at 26.  Smith did not object below, and this argument is therefore reviewed for plain error.  However, because no prior inconsistent statement was revealed to the jury, this argument fails.

Second, Smith asserts that the Government improperly presented H.E. with a written statement she had made previously.  In response to the Government's question if there were times when H.E. did not want to prostitute, H.E. testified that although she "never liked what [she] did . . . It was [her] choice.  [She] could have walked out the door."  R. 95 PID 784.  When the Government began to ask a follow-up question with, "[b]ut you have said in this written statement 'prostitution against,'" Smith objected on the grounds that the question would either elicit hearsay or was impeaching and therefore required a limiting instruction.  R. 95, PID 784.  The Government acknowledged it wanted to impeach H.E., and informed the court that it would like to give H.E. the statement to read.  The court allowed the Government to provide H.E. the

statement to see "if it refreshes her recollection." R. 95, PID 785. Smith protested that H.E. did not testify that she could not recall what she had previously said, but the district court did not respond. The district court should have permitted the Government to impeach H.E. with the prior statement, and then issued a limiting instruction that the prior statements were not to be considered for their truth. However, the error was ultimately harmless. H.E. had previously testified that she made a written statement and that the statement said she had "been in a bad situation, 'prostitution against her will.'" R. 95, PID 783. Thus, the testimony for which Smith sought a limiting instruction had already been admitted. Moreover, after reading the written statement, H.E. testified that "[t]he only reason [she] wrote 'prostitution against my own will' [was] 'cause [she] was really trying to get out of the situation that [she] was in. [She knew she] got [herself] into it and had no way to get nobody out, so [she] figured maybe the police will give [her] a ride back to Jackson." R. 95, PID 785. This testimony is arguably favorable to Smith—H.E. does not contradict her trial testimony that she prostituted voluntarily and explains away her written statement that the prostitution was "against [her] own will."

Finally, Smith argues that one other exchange with H.E. regarding the written statement was improper. After H.E. confirmed that her memory was refreshed by the statement, she testified that she did not remember a time where Smith punished her for talking on the phone with her mother. The Government then asked, "[d]id you see in your statement that you had written that?" R. 95, PID 787. Smith objected to the question, arguing that H.E. read the statement and failed to remember, but then H.E. volunteered that she had actually only read the first page of the three-page statement. The district court then permitted H.E. to read the rest of the statement to see if it refreshed her recollection, which it did. The district court did not abuse

its discretion in permitting H.E. to read the parts of the written statement that she failed to read initially, and Smith offers no authority to suggest the district court acted improperly.

Smith also challenges two evidentiary rulings during the testimony of Michael Peavey, Smith's confederate, who is mentally impaired. First, after Peavey—whose testimony was largely incoherent—denied ever being in a hotel room with Smith, the Government asked: "Do you remember talking to Ms. Woodward, who is at the table here, and Special Agent Mentzel last week and telling them in fact [. . . .]" R. 96, PID 805. Smith objected, and the district court overruled the objection. Because the Government did not finish the question, Peavey's prior inconsistent statements were not introduced. Second, Smith argues that a later exchange required a limiting instruction. The Government offered Peavey his written statement to the police to refresh his recollection after Peavey denied recognizing Smith's taser, and, when Peavey continued giving nonresponsive answers, the Government asked Peavey if he had written in the statement that he had been tased. Peavey stated that he "already explained that he went over it with the – with the federal investigator." R. 96, PID 817. Smith objected and requested a limiting instruction because the Government was now impeaching its own witness; the Government asserted that it was refreshing Peavey's recollection. After the district court overruled Smith's objections, Peavey answered the Government's question: "It wasn't about I was or were tased. I'm saying I thought that the 4th – or the 8th of April there was on a Saturday, which would be more permanent for a day that I was tased." R. 96, PID 818. The Government argues that Peavey's non-responsiveness prevented it from actually impeaching his testimony, and Peavey never confirmed making any prior inconsistent statements. The Government is correct, and, even if the testimony was improperly admitted, any error was

harmless due to the incoherence of Peavey's testimony. It is doubtful that any of Peavey's testimony, let alone this isolated exchange, had a material impact on the verdict.

Smith's final challenge to the Government's use of prior inconsistent statements arises from the testimony of Curlytta Fuse, Smith's other confederate. During direct examination, the Government asked Fuse if Defendant had hurt H.E. in a car. Fuse responded "No. . . . Not in the car." R. 98, PID 1174. The Government then asked if Fuse remembered speaking with Agent Amy Mentzel and the prosecutor about this incident, and began to ask "do you remember saying at that time that [. . .]" R. 98, PID 1175. Smith objected that the Government was about to use a prior inconsistent statement for impeachment and that there should thus be a limiting instruction. The court overruled the objection without explanation. When the Government resumed its questioning, Fuse admitted remembering the conversation, and also admitted that Smith had punched H.E. in the car. Since Fuse admitted telling the Government that Smith hit H.E. in the car and also admitted the underlying truth of that statement, no limiting instruction was required, and the district court did not err in permitting Fuse's testimony.

In sum, although many of Smith's objections were proper, the district court's errors were ultimately harmless.

### D. Right to Testify

Smith argues that the district court chilled his right to testify in his own defense. Allegations of constitutional violations, including whether a district court has infringed a defendant's right to testify, are reviewed de novo. *United States v. Johnson*, 627 F.3d 578, 582 (6th Cir. 2010).

"The right of a defendant to testify at trial is a constitutional right of fundamental dimension and is subject only to a knowing and voluntary waiver by the defendant." *United*

*States v. Webber*, 208 F.3d 545, 550 (6th Cir. 2000). The right to testify is "one of the rights that

are 'essential to due process of law in a fair adversary process,'" and sounds in the Fifth, Sixth,

and Fourteenth Amendments. *Rock v. Arkansas*, 483 U.S. 44, 51 (1987) (quoting *Faretta v.

California*, 422 U.S. 805, 819 n.15 (1975)). The right to testify "is personal to the defendant"

and is subject only to a knowing and voluntary waiver of the right. *Webber*, 208 F.3d at 550–51.

We have previously explained that we are "mindful that excessive judicial interference" with the

right to testify "constitutes a 'danger [that] is of great significance.'" *Id.* at 552 (alteration in

original) (citation omitted). However, unless a defendant indicates a desire to testify or a

disagreement with counsel as to the decision to testify, the district court is not obligated to sua

sponte ask a defendant whether he or she waives the right. *Id.*

Here, Smith's counsel had informed the district court that "[Defendant] is considering

testifying, and I imagine that would be lengthy, but of course that's a decision he's not going to

make until the very end." R. 99, PID 1209. Toward the end of the trial, Smith's counsel

requested a five-minute break to confer with Smith regarding whether he wanted to testify. The

district court granted Smith a ten-minute recess (which actually lasted twelve minutes) to confer.

After reconvening court[3] but prior to asking Smith whether he wished to testify, the district court

expressed its frustration with the pace of the proceedings:

> Look, I would prefer not to use expletives here on the record . . . but this
> group of lawyers and you, Mr. Smith, have taken an inordinate and unfair use of
> [the] jury's time, the Court's time, [the] lawyers' time, and this is nonsense.
> You've got decisions to make and we're going to go ahead, and we're not going
> to put it – trivialize it away on how many things happened within oh, an hour and
> 45 minutes. If you've got an hour – if you've got 15 minutes, that's probably
> enough, if I understand what's going on. And I'm not criticizing anybody in
> particular.

---

[3] The jury was not present for the discussion of whether Smith would testify.

> I am saying to nobody in particular that this trial has taken about twice as long as it should, and I would hope that – I guess I'd hope that something could happen now to make me look like I'm being unreasonable, but hopefully not.
> So what's going on?

R. 57, PID 322. Smith's counsel responded that Smith had previously indicated that he did not wish to testify, but had subsequently asked if he could review a video of his interview with police before making the decision. Smith's counsel acknowledged that he did not think the court was likely to grant the request to review the video. Smith's counsel then requested that the court ask Smith whether he wished to testify.

The district court declined to ask Smith whether he wished to testify, stating that "[h]e's not his own lawyer in this case, even though he's – apparently would like to act like one, and we are going ahead with this trial . . . Basically, what has happened, if there was a choice made by the Defendant not to testify, it was made. It's been made by dithering around, if nothing else, but it was made a long time ago I think." R. 57, PID 323. Smith's counsel again requested the district court to ask Smith whether he wished to testify. The district court acceded, and asked Smith: "What is that decision going to be, three words or ten words?" R. 57, PID 324. After Smith's counsel informed the court it should be a yes or no answer, the court replied: "Well, I know the answer, as of right now, he's not testifying. Now, if we want to mess around with that, we will, but it's not going to happen over there. You're getting close to contempt over there." R. 57, PID 324. The court then determined it was time to move on. Importantly, Smith's counsel then stated that he "would put on the record that Mr. Smith just indicated to me that it was his decision not to testify." R. 57, PID 324. At this point, the Government requested that the court voir dire Smith on the decision whether or not to testify to preserve the record "as to whether or not that's his decision, that he made it voluntarily and with the advice of counsel." R. 57, PID 324–25. This request led to the final exchange between the district court and Smith:

> [The Court:]  Mr. Smith, you've heard all this, do you choose not to testify?
> The Defendant:  Under – under what was said in the court, I'm going with what the Court said.  Thank you.
> The Court:  All right.  Now you choose not to testify.

R. 57, PID 325.

We have serious concerns with this exchange, and it is a close question whether the district court's comments interfered with Smith's right to testify.  However, the district court did not have an obligation to inquire of Smith whether he chose to testify because Smith never indicated that he wanted to testify or disagreed with counsel regarding his decision.  It was therefore understandable that the district court grew frustrated with Smith's counsel's repeated requests for the district court to put Smith's decision on the record.  Because Smith at no point indicated he wanted to testify and did not contest his counsel's statement that Smith indicated "that it was *his* decision not to testify," R. 57, PID 324 (emphasis added), we conclude that the district court did not interfere with Smith's right to testify.

### E.  Judicial Misconduct

Finally, Smith argues that the district court displayed judicial bias and engaged in misconduct.  This argument is partially based on the previously discussed issues, such as the court's evidentiary rulings and its alleged infringement on Smith's right to testify.  Smith also argues that the district court inappropriately criticized his case in front of the jury, forced Smith to justify why he was questioning certain witnesses, and referred to the verdict form as a "Guilty Form."

We review "a district court's conduct during a trial under the abuse-of-discretion standard.  Where the Defendant does not object to the district court's conduct during the trial,

however, we employ the plain-error standard."[4]  *United States v. Powers*, 500 F.3d 500, 506 (6th Cir. 2007) (internal citations omitted).  "A judge must exhibit 'impartiality in demeanor as well as in actions.'"  *United States v. Morrow*, 977 F.2d 222, 225 (6th Cir. 1992) (en banc) (quoting *United States v. Frazier*, 584 F.2d 790, 794 (6th Cir. 1978)).

However, it is exceedingly difficult to demonstrate reversible judicial bias or misconduct.  For instance, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. . . . [T]hey *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible."  *Liteky v. United States*, 510 U.S. 540, 555 (1994) (emphasis in original).  A district court's "expressions of impatience, dissatisfaction, annoyance, and even anger" will ordinarily not establish bias.  *Id.* at 555–56.  Judicial misconduct may be established when "the judge's remarks clearly indicate a hostility to one of the parties, or an unwarranted prejudgment of the merits of the case, or an alignment on the part of the Court with one of the parties."  *United States v. Blood*, 435 F.3d 612, 629 (6th Cir. 2006) (internal quotation marks and citations omitted).  Additionally, misconduct may be established when a judge "abandons his proper role and assumes [the role] of [an] advocate" while questioning witnesses.  *Id.* (alteration in original) (citations omitted).  When the alleged misconduct occurs outside the presence of the jury, a defendant "must overcome a high hurdle" to show bias.  *Morrow*, 977 F.2d at 225.

In determining whether there was judicial misconduct, we consider:  (1) "the nature of the issues at trial," including how lengthy and complex the trial is; (2) "the conduct of counsel,"

---

[4]  Although we have "hinted that [we] might review for abuse of discretion where counsel reasonably withholds objections to avoid inciting additional hostility from the judge," *United States v. Davis*, 361 F. App'x. 632, 634 (6th Cir. 2010); *see also Powers*, 500 F.3d at 511, both parties have asserted that plain-error review applies.  We will therefore apply plain-error review.

and whether the attorneys are "unprepared or obstreperous"; and (3) "the conduct of witnesses." *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979). "In addition, this Court has considered the tone of the judicial interruptions, the extent to which they were directed at one side more than the other, and the presence of any curative instructions at the close of the proceedings." *McMillan v. Castro*, 405 F.3d 405, 410 (6th Cir. 2005). The harmless-error doctrine does not apply to claims of judicial bias; when judicial misconduct has occurred, reversal is automatic. *Id.*

Although some of the district court's comments were questionable, they did not rise to the level of judicial misconduct. For instance, Smith focuses on the district court's purported violation of the sequestration order as evidence of bias. As discussed above, the district court did not abuse its discretion in allowing M.R. to testify despite the violation of the sequestration order, and its decision certainly did not amount to judicial misconduct. Smith also asserts that the district court's "stricter rules of evidence" explanation constituted misconduct, arguing that the district court's comments "sound[] like the judge sought to prevent a loathsome technicality asserted by defense counsel from preventing the presentation of the truth by the government." Appellant Reply Br. at 18. This assertion ignores that prior to its "stricter rules of evidence" language, the court said "I understand [Defendant's] objection . . . [and] I want to respect it enough to say that I think this is a situation where maybe some of the stricter rules of evidence" do not apply. R. 95, PID 677. Although the statement was erroneous, it did not show any bias on the part of the district judge.

Smith also asserts that the district court improperly forced Smith's counsel to justify why he was examining certain witnesses. However, Smith acknowledges that the court required both parties to explain the relevance of non-victim witnesses; the Government also explained the

relevance of its witnesses to the court. Additionally, although the district court interrupted Smith's counsel while he examined witnesses, the court also interrupted the Government's counsel. This court has found similar conduct to be "less than ideal" but not reversible error. *Powers*, 500 F.3d at 512 (finding that repeated comments that testimony was "not helping the jury" and instructions to "move on to something else" were less than ideal but not judicial misconduct). Moreover, much of the district court's challenged conduct, such as threatening to hold Smith and his counsel in contempt during Smith's decision whether to testify, occurred when the jury was not present, thus neutralizing most of the prejudicial impact of the statements.

Smith further argues that the district court engaged in judicial misconduct during its reading of the jury instructions. First, the district court stated that it had "attached to the instructions . . . a document entitled Form Guilty – entitled Guilty Form – well, I'll try again. It's a Verdict Form is what it is. There's nothing about guilty." R. 101, PID 1582. The district court then read the verdict form. Referring to the verdict form as a "guilty form" is obviously inappropriate and prejudicial. If this was done intentionally and was left uncorrected, it may have constituted judicial misconduct. However, this appears to have been a mistake and the district court quickly explained that "[t]here's nothing about guilty." *See McMillan,* 405 F.3d at 410 (explaining that curative instructions may remedy potential misconduct). Further, in reading the verdict form, the district court instructed the jury how to find Smith either guilty or not guilty.

Finally, Smith challenges the district court's conduct during Smith's direct examination of M.R. Towards the end of the trial, Smith called M.R. in order to impeach her regarding the extent of her current contact with Steven Barber. Smith's direct examination of M.R. lasted eight minutes. During Smith's questioning of M.R., the district court interrupted and stated that

"I don't know, I mean I can guess maybe, but I don't know what value this is to the Defendant's case—but it isn't much, whatever it is." R. 101, PID 1453. At the conclusion of Smith's direct examination of M.R., the district court stated to the Government that "there's always a possibility that, maybe it increases with years, that I don't understand what the parties are using a witness for, but I don't think you need to spend much time on this. I don't think it is a major obstacle for the Government to overcome, however you interpret [M.R.'s] testimony." R. 101, PID 1454. During the Government's cross-examination of M.R., the court stated that it did not "understand, on either side, this going back and forth with [M.R.] . . . I don't think it's much of – has much weight to it," and characterized the testimony as not "anything that [the jury is] going to use to make a decision they're going to have to make[.]" R. 101, PID 1456–57.

The district court's criticism of Smith's impeachment of M.R. was improper. This isolated incident, however, is insufficient to show "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555 (1994). We thus decline to find that the district court engaged in judicial misconduct.

## F. Cumulative Error

Lastly, Smith argues that, even if the previously-discussed errors are not individually sufficient to warrant reversal, the cumulative effect of the errors deprived him of a constitutionally-sound trial. We "acknowledge that [e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000) (alteration in original) (internal quotation marks omitted). There is no question that Smith's trial was flawed. However, "[a] trial need not be 'perfect' to withstand a due process challenge." *United States v. Walker*, 506 F. App'x. 482, 488 (6th Cir. 2012). The Government

presented overwhelming evidence of Smith's guilt.  We are thus convinced that the cumulative effect of the district court's errors did not render Smith's trial fundamentally unfair.

## IV. Conclusion

For these reasons, we **AFFIRM** Smith's conviction.